So our next case is 25-1097 Anash, also doing business as Wyoming Valley Beshiva v. Borough of Kingston et al. Mr. Brunel. Am I pronouncing that right? Yes, you are, your honor. How are you, sir? I'm doing well, how are you, sir? Great, thanks. May it please the court, my name is Alex Brunel and I represent the appellants in this matter, the Wyoming Valley Yeshiva, its community members, and Rabbi Shimon Hellinger, and I would like to reserve four minutes for rebuttal, please. Sure. This case fundamentally involves two properties. The parties all agree they're religious in their nature, religious in their activities, and essentially the case involves violations of a plurality of RLUIPA provisions, the most significant of which is the equal terms provision, and also what I would call a blatant lack of due process, the most blatant violation being that there is a zoning ordinance that precludes closure as an enforcement remedy and a strict textual analysis of that ordinance would show that there's a preclusion on the ability to close a building due to a violation in zoning. Now what I believe this court could do is analyze strictly and likely dispose of this case solely on the equal terms provision of RLUIPA and dispense with further analysis at that point. We respectfully believe the district court misapplied Lighthouse, Lighthouse 2 decision, the precedential decision in this court, and what essentially happened is there is a regulatory purpose, the analysis that's done for a land use appeal under the Lighthouse standard, its five-prong standard, and what it is is you don't look to the general objectives, you don't look to the preamble of the zoning ordinance, you look to the regulatory goals associated with a specific zone, like the community commercial zone, which is what this property is located in, the C2 zone, and effectively what we find here is there is no regulatory purpose defined for a community commercial zone. There's the ordinance is completely silent on what the goals are for that zone, and in Lighthouse there was a similar situation with respect to the regulatory purpose when there's no specific goal that exists for secular or religious uses in that zone, when that hasn't been defined, well then it's not clear that there's an impact, an adverse impact, that would be greater than say an assembly hall or a library or something of that sort. So do we have a factual record to support those sorts of arguments right now? We do, your honor, yes. Well, as I understand it, so your clients were giving these notices of non-compliance in essence, and was there a give and take? Was there a back and forth? Was there any effort to bring these particular properties into compliance? So the notices declared, made unilateral declarations by the borough, that you are a school and you are a dormitory, and then they said if you want to comply with the zoning ordinance, you must apply, you must seek a special exception as a school and as a dormitory. So did they do that? Well, there was no, they did not, because they were not a school or a dormitory. It would have been a futile exercise. Now the borough recognized the religious aspects of these properties, but they said they wouldn't entertain them ever being anything other than a school or a dormitory. They said there's no, they did not give the opportunity to appeal, the record is clear, there was no opportunity. Based on the record we have, there's some pretty compelling arguments, there's evidence that these facilities were being used as a school and a dormitory. Well, the one was advertised as such. The one was a yeshiva and the other we would call a religious congregate living location. And why do I say this? I say this because if we look to the zoning ordinance, there's a definition of a school and the plain textual definition of a school is not met by these activities. Now the district court looked to a dictionary definition, they ignored the zoning law, the zoning ordinance definition. There's a clear zoning ordinance statutory definition, that was ignored and the dictionary definition was utilized instead. But can I, and actually because it sounds like this is important to my colleagues as well, can you just explain for us a little bit more how your client's institutions are different from a school? What I take the argument to be is that when we're talking about school definitionally here by terms or colloquially, we're talking about a standard secular institution that provides certain kinds of broad classes and instruction. And that instead what's happening here could be described in some terms as having educational components, but it's all religious in nature. It's about religious teaching, it's about spiritual teaching. And so just like in another context, like other religions, there might be something like a Sunday school, that's a narrow range of information about a religious text. That's what's happening here, not the jurisdictions definition of the kind of school that would educate you to go to college or that kind of thing. And you're correct, Your Honor. There were no secular classes of any kind whatsoever. And what effectively this is, is it could be classified as a place of worship very easily. The definition of a place of worship in the zoning ordinance recognizes religious instruction and study. So this could be easily classified as a place of worship. And we would happily, they would happily have applied as a place of worship, but there was at least one other property where they tried to as a place of worship, as a library, actually, because a library is permitted in EC2 zone, but a place of worship isn't, of course, by right. And they were, the borough effectively said in district court testimony, we won't entertain it being anything other than a school. We won't entertain it being anything, we won't entertain it being a library because prayer services happen there. So the mere introduction of prayer services made it not into an allowable use. So this is, if we go back, I really have to go back to equal terms because this could easily be classified under the zoning ordinance as a place of worship, because the place of worship is defined as allowing religious study. And if it were what you do in the C2 zone on an equal terms basis, as you look, you have 62 allowed uses. You can have a bowling alley, you can have a library, you can have a daycare. Interestingly, you can't have a religious daycare. Was there a protocol in the local ordinances and statutes that would have allowed for some sort of variance to the, what was already there, so to speak? So I would refer to White House too, where the point in point was made, I think by the DOJ, that the idea that you need to apply for a variance, the idea that you need to apply for a special exception, that that is the unequal treatment. So I will answer your question directly. And yes, you could have applied as a special exception and a variance. You actually need both independently as a place of worship. So 62 uses are allowed as right. And if you look down the use table, PPPPPPPPP, you get to place of worship, essay, special exception. Now, in addition to having to apply for a special exception, you also need to apply for a variance. So why do you also need to apply for a variance? Because if I just may briefly read the list. And when you say that, you mean that even if you were a special exception, you still cannot open your doors? You're correct, Your Honor. Yes. You're correct, Your Honor. And the reason why is because there is a set of supplemental regulations. Article 8 of the zoning ordinance has supplemental regulations and the supplemental regulations like you're allowed as of right, you're allowed to have a movie theater, an arcade, a bowling alley, a municipal building, a library, a daycare, but not a religious daycare, a dance studio where secular education is taught. Forestry is permitted in a C2 zone. You're allowed to chop down trees in a C2 zone, but you're not allowed to have this place of worship. And why? Because the the supplemental regulations in Article 8 say that you need to have at least one acre of land. Now, this is argued by the defendants. This is argued, well, we need the acre of land because places of worship compared to all these secular uses, it needs a lot of parking. OK, it's a lot of parking. But if you look to Section 1001B of the zoning ordinance, all C2 uses, including places of worship, are exempted from parking requirements. So there are no parking requirements. So the defense that we need a lot of parking for a place of worship doesn't meet the regulatory definition at all because parking is exempted from the C2 zone. It is. It is. I mean, it is interesting that in terms of process, just have you have you thought, you know, in hindsight, what should we have done? The the borough is coming to us. They're saying we think you're a school. We think you're a rooming house. And therefore, we want you to go and begin to apply for exceptions and variances to meet this. And you say, gee, we disagree with that. Have you thought, though, about maybe, OK, you know, every now and then you can kind of, you know, preserve an objection. You say, you know what? We preserve it. We think you're wrong that we're a school. We think you're wrong that we're a boarding house. But we'll play your game. So so I guess in my head, I'm like, I can see why you licensed by a state. You aren't. I can see why you're wrong because there's other things, maybe less clear. But but when it comes to definition of rooming and or boarding house, you can see, no, that's not us. But I'm just a little curious in terms of. Why don't you play the game? Why don't you say, hey, you know, we're going to preserve our objections and we'll now apply for these special uses as the firm. Maybe that's not legal strategy, but it does strike me that we want to say, hey, this is this is land use regulation. You didn't do that. So you're right. There was no application for there was no application of that sort. But I'll say on that point that it would have been futile because a variance could never be granted. There are nine pages of requirements for a variance. And those requirements include being unable to show that the property has any other permitted use. Well, there are 62 uses other than a place of worship. So so to be able to show that there was some other use that that it could, you know, that that's the only use it could have had would be impossible. It would have been a futile path and futility. Council is the House of Worship the only entity or institution that's subject to these special exception plus variance requirements under the current zoning law? Your Honor, substantially. Yes. Yes. If you look at the supplemental regulations, acreage requirements are imposed far and few between. And the vast majority, the 62 allowed as of right uses have no including social halls, membership, nonprofit social civic organizations. There are no requirements for them for acreage. And there is for a place of worship. Maybe I think a chemical manufacturing plant has an acreage requirement or something like that. But that's not even allowed. Can you and if we then also my my colleague was asking about why you didn't play the game. Can you explain what kind of would have been a burden to playing the game or applying or describe for us your argument? If we just think you should have tried harder. And and first, the burden just for burden for equal terms purposes, substantial burden. It's a strict liability analysis, just to remind the court. But but for why it wasn't done is effectively, I believe Rabbi Hellinger met with them, wanted to cooperate. And he was basically told you are a school, you are a to to that decision, no appeal right to the declaration. And he just he just didn't. He thought he was being treated unfairly. And he thought the goal was to get them shut down, which ultimately happened. And I'm sorry, just keep interrupting. So your argument there is, as a constitutional matter, the zoning ordinance does not provide for enough process. If you're in this category to be able to challenge a determination and get notice and hearing just across the board? Well, I think our argument most fundamentally is that this is a blatant violation of equal terms. But there is a second argument under due process. And that is twofold. There's two elements of it. And I'll say them briefly in the interest of time. One is that closure is not allowed in the zoning ordinance. And if you read the zoning ordinance, it gives enforcement remedies. So if you did look at a substantial burden or least restrictive means test, something of that sort, closure is not allowed. They're allowed to they're allowed to find you $500 a day, but they're not allowed closure building. So that was an ultra virus action on the part of the borough. The second due process argument is there the district court found there was some confusion between two provisions. There is no confusion a statute should be taken collectively as a whole. There's one that's a preamble that effectively says a zoning officers allowed to issue a letter. And then there's a section that says what that letter must contain called notice of violation 1205.1. And it very clearly prescribes in the ordinance that you must give notice of the right to appeal. Because if Rabbi Hellinger disagreed with the idea that he was a school, well, he should have the right to the right to appeal that and the statute recognize that it was missing from all of the communication. What are you what are you asking us to do from a very fundamental perspective, right from a boots on the ground perspective? What are you asking us to do? Fundamentally, remand to the district court, we very much think they got lighthouse incorrectly interpreted remand with instructions to grant the preliminary injunction and allow the reopening of 239 and 44 pier street. So can I Yeah, please. Let's just say that the community I mean, something motivated, obviously, the zoning changes. Most recently, we asked your opposing counsel about that. But do you believe any, like, let's just say there is a preliminary injunction, and this can't be applied, what would be in your view, a lawful way to regulate the community has concerns and is worried about how this just yesterday is currently being operated. I understand. I think that the lawful way to regulate the community would be to treat religious uses on equal terms with non religious uses with secular uses. And I think that's how it's not being done, right? Can you just explain for instance, this is a local detail, how exactly that would work. So let's just I mean, are there other categories of regulation here that would address concerns about wiring or digging in the ground or those kinds of things, but in a more permissible way? There are your honor, there are other supplemental through that how that would Yeah, yes, of course. So let's say a place of worship, let's say the fact that a place of worship is not permitted, as of right is deemed to be an equal terms violation. Okay, so if it gets remanded, it could apply singularly to the plaintiffs. Obviously, we feel the whole Jewish community in Kingston is affected by this, we invite the something of the invalidation of the zoning ordinance eventually, if not now, that could be on summary judgment, of course, but but to answer your question, I'm sorry, I didn't yet is, well, yeah, I mean, when I'm basically asking is, if the if places of worship were not set apart, and they were treated equally to movie theaters, or whatever another comparable institution would be, is there a way under those parts of the regulation, so an equal application to still get at some of these concerns it the community might have, but in a less intrusive way? Absolutely. And the reason why is because zoning ordinance, the I'll call it the what we think to be the illegal zoning ordinance is independent from the safety regulations. So if the community has safety concerns, if there are concerns of that sort, they're still entitled to exercise, it's called the International Property Maintenance Code, the IPMC, that independently governs issues of safety. And that's not really an issue today, we're more focusing on equal terms facial violations, but, but the community would still absolutely and unquestionably be protected, because they could still do inspections, if they had concerns, they could still issue violation notices, they could still do anything that was within the purview of the name of safety. So safety, safety, we believe was brought in post hoc, just just been and there are letters from the borough solicitor, saying that the closure was due to zone only due to zoning, not due to safety, safety came in after. But safety would certainly be preserved for the community, because inspectors would still exist, inspections could still be done, violations could still be issued, and condemnations on the basis of safety could still be done, we're just asking that there be a determination that the inability that the handcuffing of the ability to apply, let's say, as a place of worship, let's assume we agree with you, we send it back, say the injunctions in place, and then the borough comes back and says, we got a whole bunch of safety regulations, you got this font or this water in the basement of this particular building, you got exposed wires, you got unsupervised men or students. So you have to come into compliance within 30 days, we're going to close you down. Would that be okay? I think well, so they shouldn't be able to, they did. And the answer to your question is that would be what the argument that I just made to judge mascot effectively that yes, if it's a safety related closure, and there are bonafide safety issues, we are not asking this court under any we don't even want safety to be an issue. In this case, frankly, it can be but if they want to allege safety comes to the conclusion their safety, their problems here, and you got to you got to fix the problem. Yes, yes. And absolutely. I don't think there would be I don't want to speak prematurely for my clients. But I think if there were bonafide safety issues, they would want to fix them. Now, just just on that point, one very small thing is the closure happened a year and a half ago, or a year and x months ago, to date, there has never been a report provided, they asked for a report, there's never been a says, add smoke detectors and fire extinguishers. Okay, we could add smoke detectors and fire extinguishers in five minutes, if that was truly the only thing that today, that's the only safety issue we even know of that was identified by the borough is no reports have ever followed the condemnation. So, you know, you know, it's interesting, because as the safety issues come in, it's one thing to say, my clients not going to push those. And it's another thing for us to think about the broad sweep of the law with respect to safety. And so maybe not an equal terms, but maybe on substantial burden analysis or something like this. Let's just say you have a house of worship that has just absolutely bogus wiring, the wiring is just a fire waiting to happen. And then the safety inspector comes in and says, Oh, we're shutting this down right before your, you know, midnight Christmas mass. So so now you say, Oh, my goodness, you substantially burned. All right, we can't hold midnight mass before, you know, you know, without electricity, would you say, hey, we get to override that safety concern in this instance, because, you know, yes, the electrical box might blow at any second, but dang, you know, we, it's a substantial burden on our religion. You know, I'm, where do you think this? What do you think this borderline is? I know, I know, you're saying you're not going to push it. But if we write on this, you know, you know, we're setting lighthouse, which is two decades old, nearly as, you know, every word matters. What do you think? That's an interesting question. Again, so if we're going to safety, and again, obviously, we think, you know, no, no, no, not asking. You said all zoning. So the safety related issues, what my answer to that question is, there's a whole swath of law for safety related issues. And that swath of law, in my opinion, really isn't under review by this court. What's under review is facial zoning violations. But if that were the case, as I understand it, the international property maintenance code would take control. And that is its own body of law. And what that effectively says, interestingly, what it says, that and in your example, with the extreme wiring thing, there's this provision that says, if there's an absolutely exigent circumstances, it can be closed as a dangerous building x, y, and z, that closure is authorized as a matter of law under safety related provisions. This closure, the record makes clear was due to zoning, and, and it's clear on its face, it's true zoning. But but there would be there would be remedies that the municipality would have. And I don't think any ruling by this court would preclude or limit those remedies. Well, also, it just strikes me as we begin to think, just, you know, maybe not this case, but as we have an eye on safety concerns, the more that safety concerns exist, the easier it's going to be for a municipality to begin to meet the high demands that may come with RLUIPA, such as, you know, strict scrutiny, least restrictive means, the extent that you want to begin to apply those or reasonableness or whatever your standard is, you come with the more compelling safety means, it's hard, it's it's easier for a municipality to say no, this is RLUIPA permissible. Do you agree with that? Do I agree if you could kindly restate that? So do I agree that safety concerns trump RLUIPA? Safety concerns? Well, I think safety concerns are, are... They're justification for municipalities to to be RLUIPA compliant. That was that's a deep concern. That's a deep concern. That's one of the concerns we think is going on because safety only came into into play after after closure. So that's a very deep concern. And I don't know the answer to that necessarily how to solve for that. I don't know. Was your contention here that the safety concerns are being used post hoc to justify what's actually animus against a religious institution? So the borough is framing it as religious animus and discrimination. I think that we're alleging that and it's more it's more RLUIPA terms violation and a due process violation than us overtly saying anyone is religiously that there's any overt religious animus. But what would be motivating this? I mean, and maybe this is not, I guess, a purely legal question. So, but I mean, what would be motivating it if it's not? Like, why did this come into being all of a sudden? Maybe this is more a question for your opposing council, but... So it's a fascinating question. The Jewish community in Kingston has been growing very, very rapidly over the past, I would say six or seven years and not to say six or seven, I'm sorry. But I promise I'm not trolling the court. But the during that time, there was a pre 2023 zoning ordinance and that allowed places of worship as a matter of right. They were considered semi-public uses. So those were allowed before the 2023 zoning ordinance. And then you have this adoption that just arbitrarily keeps most things allowed and then disallows places of worship. Now, I don't... I'm sorry to interrupt, you know, it's really weird because the adoption, the 2023, I think has a grandfather clause. And so, and so like, I guess I'm just, I'm confused at one level in terms of why we're even under the 2023 regime when you have a grandfather clause. Can you just, yeah, maybe this is a question for the municipality, but what's your take on that? I mean, don't you think that, don't you think that you're kind of grandfathered in? I would, we would love to be, candidly. The answer to that take is they said that the, that these started as offices and as a single family home and that the use was changed over time, surreptitiously in 2023 or 2024. And there's proof that that didn't happen. There were, there was always the same type of religious use since the beginning of the beginning of the case, but the allegation is that the use changed and then we would need to reapply as a school and a dormitory. Now I will point out for the dormitory allegation, like there is a, there's something called a group residence and a group residence says congregate living by no limitation on individuals. And it's allowed as a right in a C2 zone. It's permitted in a C2 zone. Yet when you have religious congregate living, it's somehow prohibited without seeking a special exception of variance. And, and the definition of a place of worship even recognizes the possibility of single family home. So this definitely comes under the purview of what would constitute a place of worship. And, and that brings with it, the burden of not just one acre at that point, but two acres, because if you have a religious daycare with your place of worship, an additional acre is required in order to have that daycare. So regular daycare, secular daycare allowed as a right, religious daycare, two acres of land required, even though there's no parking requirement. So what could possibly be the regulatory justification for this? And the motivation, I can't speak to the motivation. I, if I would invite this, if this court wants to draw on inferences to motivation, more power to you, but I know that something doesn't make sense. You know, frankly, we've probably drawn inferences of discrimination on less, you know, unless, you know, timing is the number one thing that we usually look for, for, you've got a great timing case. I mean, I think. Sorry, I didn't mean to interrupt my colleague. That's fine. So you've referred us to the list of letters on the zoning regulation or zoning chart. And just so I understand, I know we've got the P, permitted use, special exception, which is an issue here, non-permitted, obviously is nothing. C, conditional use. Do you perceive of the special exception being more burdensome than conditional? What's the difference between those two categories? So these are independent things, a conditional use, which was actually imposed on the school and the dormitory, which is undefined by the zoning ordinance that would require a conditional use that is more onerous than a special exception, but the special exception is also independent from the variant. So you seek a special exception. You have to petition the zoning hearing board for the right to be a place of worship. So that, that is the burden that is the unequal treatment, but then you also need a variance for the acreage. So, so, so hyper technically though, I think the definition say special exception requires zoning board approval, conditional use requires municipal approval. And because it requires municipal approval, that's considered more burdensome, you say? I would, I would, I would perceive it as most likely more burdensome. Yes, your honor. But, but then there's also a variance, which is independently required for the acreage requirement. So let me go back to the boots on the ground perspective, right? So let's assume we agree with you and we, we send it back to the district court for the case to continue, right? What would happen in the short term? In the short term, there would go back to the status quo. I mean, there has been a torpedoing of, of the, of the congregation. So I can't say it would just resume back at status quo. There would probably be some sort of rebuilding of what has been lost. I meant the two properties, right? The two properties would be repopulated, so to speak. I believe, I believe that would be the ultimate goal of the congregation. Yes. Now, if there are safety concerns, if your thought goes to safety, that would be an independent analysis. And if there are any, we would ask the borough, of course, finally give us a report. If that was a real issue, even though it came up after the closure. So if we were to reverse the the denial of the preliminary injunction, you would view that is at most prohibiting the borough from using the zoning-based rationales that it had for closing the property. If it wants to come forth with new zoning-based rationales or safety-based concerns, you wouldn't say, you can't do that. We've got, we've got an injunction in place. You would say separate issue. We'll have to tease that out and we'll have to play that out in real time as that happens. Is that your perspective or would you take this and run it to the, to the borough solicitor and lay it at the doorstep and say, we're immune, never touch us? Well, I think that's the, you guys set powerful precedent, right? And I think that's the fear, not just for us, but for others. And I think the answer, the direct answer to your question is no, we would, we would, as long as we can get places of worship, we probably, they may apply as a place of worship, which the definition encompasses. And as long as they're not treated less fairly than secular uses, the plan would be to, you know, I don't think in terms of the scope of the injunction, you wouldn't, if we reverse the injunction and the borough shows up the next day with safety concerns, you may have independent objections to those and all this other stuff, but you wouldn't sit there and say, leave my property. I just got the, I just, I just got the injunction. No, your honor. No, no, that's not the goal here. The goal is. Do you, do you, are you, is your position though, that facially the special exception category should not apply to this place of worship? So that is the position. And the reason why is because you have 62 uses that are allowed. They have met the definition of being comparators in other courts. I believe in this court. Can you detail just a handful of what those are? Of course, please. Yes. So the comparators that are allowed is remember one of the big allegations here is the parking and position, the burden on the area. So entertainment facilities, movie theaters, municipal buildings, libraries, daycares, again, daycare allowed as of right two acres for religious daycare, martial arts studios. Well, there's secular learning going on at a martial arts studio. So how's that? Okay. And so then necessarily you must be saying that houses of worship are distinct from some of the things that are under special exception, like a hookah lounge or mixed juice structure. I mean, there's a number of membership clubs because there are quite a few, I mean, there are 10, I mean, I didn't count, but a number of things that are under special exception. So your position must be that you're categorically distinct from those animal daycare, automotive repair garage, continuing care facility. The position is that a hookah lounge isn't protected by real loop is equal terms provision. So the position is basically that the place of worship, I say that, I say that. But I'm more, but you're, but you, but to find for you, we have to be saying, I think places of worship are kind of your, basically your position is you're being substantially burdened and treated unequally from comparable institutions, which I understand. If I look at all the things that are permitted, you're saying we're like those. I'm now asking the question from a different direction. I'm saying there are more than one. It's not just places of worship. That's special exception. There are 10 or 15 here. So can you tell me how it's unequal to lump the place of worship in with those? It's, and if you want to address that on rebuttal, that's fine. But I'd like to get your, no, no, please. I'm happy to address that. It's, it's not, I think the analysis is not how it should be lumped into the special exceptions, but why it shouldn't be among the 62 allowed uses. Okay. So, but I, I'd like you to do your best. Okay. Can I just, can I just tease this out, you know, and this might be a different perspective than the one judge mascots getting it, but maybe it informs your answer to her question, which is, is there a way for there to be a special, a house of worship under the zoning ordinance without having a conditional use or a special exception? No, there's not your honor. No, there isn't. So, and so, so we've got, so we've got a zoning system that there can be any, almost any use in the world, except for a hookah lounges and stuff like this that require nothing. It's just a P, but, but there's no way in no zone is house of worship given P status. That's actually, that's true. I'm sorry to answer for you. Yeah. Yeah. I want to hear from him. It's actually prohibited in five zones. It's N, N, N, N, N. Yeah. So completely prohibited in all these zones. Also kind of arbitrarily. We're not into that. We're not in that, those zones, but then there's an SE for this one thing. And it's a place of worship. And that's, that's okay. I guess somebody, I mean, I want to hear from him because that's tough. That's tough. All right. Thank you, your honors. Good morning, Mr. Rhodes. Good morning. May it please the court. I'm Steven Rhodes with McMain Linehauser. We represent the municipality of what used to be called the borough of Kingston up in Northeast Pennsylvania, as well as the two employees, the code enforcement officer and the zoning officer who are also sued in this case. I want to first say that we respectfully ask that the court, of course, affirm the judgment of the decision of the lower court in denying the preliminary objection. But I want to make kind of the opening observation here, which is that we are strictly limited to the record that was developed in the court below. That is the complaint, the answer, the briefing that was taken in advance of the preliminary injunction hearing, the testimony of the three witnesses, which were two rabbis from the appellant organization. And this record includes the 2023 zoning ordinance. It does. And let's just follow up on that question, right? That 2023 zoning ordinance does not permit a house of worship. Generally, Judge Mascot, that's how she reads it. She says, that's how I read it. And the only way that there can be a house of worship in this municipality is through the municipality's approval or the zoning board's approval through a conditional use or a special exception. How is that not a burden on religion? How is that not just facially? When we look at this chart, how isn't that just facially a colossal problem for you? Judge, I want to address your question, but I also want to do it in the context of what is the posture of this case? We're not here on the merits. We're here to determine. No, but it's likelihood of success on the merits. That's right. And so just walk me through, how can this possibly be permitted? You basically say, no, there will be no houses of worship in Kingston unless either the zoning board says yes or the municipality says yes. But there can be anything else, all these other things, no problem. Don't you think that just when you read RLUIPA, that's just a huge problem? Your zoning ordinance 2023 just might have a facial problem. And that means that even good faith application of that, which, you know, you got tough facts for good faith, is going to be a big problem.  We recognize that. And your honor, Kingston relied upon the professional expertise of an outside consultant, Jack Farrelly and associates, to revamp their ordinance. And this is actually part of the underlying record that finally was accomplished in 2023. And it seems like there was no consideration in that process of any RLUIPA implications whatsoever. So the, I don't mean to say we're sort of dumb and happy here, but I mean. It's kind of hard. That's kind of hard when you have a federal statute that's targeted this, and then you announce a new zoning law that doesn't do that, especially when the federal statute, at least according to the Supreme Court, provides greater protection for the exercise of religion than the First Amendment does. Understood, understood. And you didn't account for that. I'm sorry, and you're saying that from what we've got in the record, it appears that there was no accounting for that. There was no accounting for it, except to the extent that there are, by recent count, 11 religious places of worship that have been established well before the new ordinance went into effect in 2023. And there are additional ones such as the appellants in this case that are part of a growing religious community. And they have been more accepted than counsel would want this court to understand. It doesn't change the procedural. If we're in equal terms, or if we're in a burden analysis, the fact that someone can overcome unequal terms, or the fact that a person can overcome, a house of worship can overcome a substantial burden, doesn't mean that the terms were equal, and it doesn't mean there wasn't a substantial burden. So you're looking at outcomes, but we're looking at whether the terms were unequal or whether there was a substantial burden. So those outcomes, I'm not saying they're irrelevant, but my goodness, they're a little tangential, right? It's certainly relevant. I understand that, yeah. The ordinance applies to the 10 or so other types of uses that Judge Mascow referred to that also require a special use or conditional use exception in order to be permitted. So we don't feel that the ordinance is necessarily treating religious institutions differently. It's just setting a bar for a number of others while not requiring that of a number. So when it comes to treating religious congregations and assemblies differently, why weren't they given any notice? The municipality declares that they're a school, declares that they're a boarding house instead of a group living, and doesn't give them the ability to challenge that, just says, accept our determination, doesn't even give them notice. Because we did give them the ability to challenge it, and those letters, which were part of the joint appendix in this case, say that you must first apply to the Zoning Hearing Board to challenge the determination of the zoning officer. You'll see those letters come from the zoning officer, David Yefko, and he says, our determination is that you are using 44 Pierce Street as a school. You've advertised it as a yeshiva. It was widely advertised on the Anosh, Inc. website as a school of religious education for young boys, a quorum. And it also said, in launching the yeshiva, that we have a dormitory just one block away. So should we use what they advertise on their website, or should we use the specific definitions that are in the 2023 Zoning Ordinance to determine whether something is a school? But, Your Honor, they were characterizing themselves as a place of learning. No, no, just, just, just, I hear you. But what should we use? Should we use, it's a zoning-based infraction. There's a specific zoning term for school that says licensed by the state. Right. You aren't contending that Pennsylvania licensed this, are you? No, we're not contending that they have. We were uncertain as to whether they should, because of the activity that was going on there. Because what the neighbors were observing, and ultimately our zoning officer was observing, is that there were 15, 20, 25 boys going in and out of this building throughout the course of the day. Some of them were residing down the street, 8, 9, 10 of them at a time, in a building which the neighbors were reporting to us appeared to be unsupervised, that there was not adult supervision. That's contrary to what one of the rabbis testified to at the hearing, said that there were people living there, but that's not the way the information came to us. So obviously there was this concern that these uses were going on that were not consistent with the original permitted uses for the property. And our zoning officer is just trying to do the job. What's in front of him? Is this a permitted use or not? If he's trying to do the job, then why didn't he stick to the definitions of school and dormitory that are in your zoning code? If he's just trying to do his job, why didn't he just check down that and say, gee, is this licensed by the state? And that's so easy to check. You can find out if a hairdresser is licensed by the state. Finding out state license, especially Pennsylvania where a lot is licensed, that's not a big ask. I think you can infer this from the record. They obviously did try and check that, and they determined that it was not licensed, which was part of their concern, that you seem to be carrying on a school that's not licensed here. But if it's not licensed, it doesn't meet the definition of school under your 2023 zoning order. So we determined that it was at least a place of worship, right? Because we understood that there was religious study going on and prayer, worship under the broadest terms. So we said to them, and this is all part of the record, they had one of the most widely known land use lawyers, Dave Schrager, Northeast Pennsylvania, representing them in discussions with our solicitor. He testified at length, Harry Matern testified at length to this at the hearing, and that they were trying to engage the rabbi, Rabbi Hellinger, who owns the properties, to follow the ordinance, to apply for a special exception, to apply for a conditional use with respect to the use of the dormitory. And our ordinance provides a mechanism to do this. And the case law, and this includes enforcement of safety issues as well as the right to enforce zoning ordinances, we need to have public order and safety in our communities. And if we're not permitted to enforce our zoning ordinances, then all of that is lost. There's chaos. Who is saying you cannot enforce your zoning? I thought we were just saying facially we're concerned, but the zoning ordinance gives no ability to have a place of worship without the government approval, which seems like a facial violation. That gets to the heart of what actually happened here. So when our solicitor reached out to Rabbi Hellinger, and ultimately in two meetings with Rabbi Hellinger and his counsel, the focus was on, we need to get in into these buildings and inspect them because it appears that you've changed the use from what was originally approved. First, 44 Pierce was approved as an office space because that was the existing use that it had. And 239, the existing approved use was as a single family residence. I don't think that's directly responsive to my question. I'm suggesting that your ordinance is operating almost analogously to a prior restraint where you may not have a place of worship unless somebody comes and petitions to you, please, please let me have my place of worship. And then if you grant it, then you've got all these inspections. That's different from a situation where the place of worship is permitted, but there are still equally applicable basic safety things in place, which is, as I understand it, more like what the system was prior to this new law. Understood. And my response, Your Honor, is that they did not avail themselves of the process that was available to them as well as everyone else in the community to be able to conduct a particular use. And I'm asking you to give me your best argument about how a prior restraint that you may not have a place of worship without government approval is consistent with the First Amendment and RLUIPA. Can you articulate that for us? We never prevented them from having a place of worship. You closed it down. We closed it down. And it's currently closed down. And it's currently closed down. We closed them down because they were conducting a school. So if you disagree with our interpretation of your zoning ordinance, you're telling us that by its terms, the zoning ordinance would permit me to go into your town tomorrow and open up a place of worship. Without any approval. To be properly permitted, you would need to apply for. So the answer is no. So there can be no place of worship unless the government is asked permission to have one. That's right. It almost feels like this zoning ordinance was designed without any concern for RLUIPA. I can't disagree with that. And again, I'm trying to remain within the record that's before the court. But we believe that the district court was correct in her analysis that because the plaintiffs below had an opportunity, a process, a mechanism, and in fact, a very willing, engaged municipality trying to show them what has often been referred to here as the roadmap of how to gain approval for this use, that they were not at the point of saying that they were excluded or that they had a substantial burden or weren't being treated equally as compared to others. Because as she said, look, I get it. I get it. I think that that, you know what, if we weren't in RLUIPA, if we weren't in the statutory demands, some of which are scrutiny, if we weren't in all that other stuff, I understand. But we're just in a different universe. We do have a compelling governmental purpose, however, in trying to maintain an orderly of zoning. And of course, what follows it are the safety concerns. And I don't want the court to lose sight of the fact that in this particular case, despite our several meetings with Rabbi Hellinger, he refused to permit even safety inspections of his buildings until about halfway through this process. He finally permitted an inspection of the 44 building that he was using as his office in the school because we learned that they had been excavating the basement to build a mikveh in the basement without any building permits, without any oversight or inspection. It's a serious construction project. And eventually we then allowed them to continue with that construction and sort of gave them after the fact building permits and permitted them to finish the project. What year was that? That was in 2020, early 2024, I believe. It was right in the middle of all of these negotiations. Were there inspections of the property prior to the new zoning ordinance? No. There was an inspection done at the time the rabbi purchased the property in that building in 2020. And he permitted those to occur. Pardon me? The rabbi permitted those inspections to occur. Well, actually the inspections were done, I believe, before the rabbi purchased them. They're part of the transfer process in Kingston. So the property has to be inspected. Yeah. So that's the way that works. I believe that on the record that's before the court, that the district court properly determined that there was not evidence of irreparable harm because as the rabbi himself testified, they can worship and they must worship anywhere 24-7 was his phrase. And while it is an inconvenience, it is not dispositive of irreparable harm. I mean, that position is colossally hostile to religion. The notion that you could shut down a place of worship and not substantially burden religion. We're going to close a church. We're going to close the synagogue. But since you can pray to God anywhere. Can I ask you then to reflect back on the question that you asked my colleague about what do we do if the building has all these very serious safety concerns? Is it permissible for us to not protect the public? No, I mean, rhetorically, I think the answer is now we're thinking about RLUIPA. Now we're thinking about least restrictive means. Now we're thinking about this other stuff. I think that that's what's missing here. The notion that it's a very different concept than irreparable harm. There may still be irreparable harm if you shut down a church right before midnight mass. That may still be irreparable harm, but you get then the likelihood of success on the merits and you say, my goodness, I was about to be a huge fire. This was going to be, you know, a co-op. But you can sit there and say, you brought this up about harm to the extent we want to isolate harm. I think when you tell people you can't worship, you can't pray here and it's not irreparable because you prayed to your God on your own time in your own place is just not an answer to irreparable harm. Is there a minimum, like what does it require to be a place of worship? Is there a minimum number of people gathering? No, there's not. So if I had 10 people having a Bible study, I would have to get the zoning board's approval to have that Bible study. If you wanted to consider, if you wanted your property considered in terms of its principal use, then that's what you should do. And that happens all over of all religions. People get together that way, but that's not the principal use of their own. But it doesn't make shed that was purchased and it held daily Bible studies that would not be permitted without going to the town for approval. It doesn't make it a place of worship. Well, that's what I meant.  Yeah. So wait, the principal use is still somebody's private residence. No, I said, if I purchased a separate little shed somewhere that was not a residence, it's just a little structure. On a separate property. Sure. Maybe you don't get your permission to do Bible studies every day. And that shed your honor.  I believe that many of these things are addressed in the absence of any formal action.  And I believe the record clearly demonstrates that Kingston bent over backwards to try and accommodate the uses the changed uses that were going on. But for the fact that they were never permitted to even inspect the 239 property where the boys were living. And the photographs that are part of the record demonstrate that our concern was a very valid one. These boys were living in dangerous conditions. And and as the solicitor referred to in his testimony, he came to the point where he believed that we had or he had more concern for the safety of these children than the community did. And that that's a problem. But the last thing I'll say is that just in terms of procedurally of how we're here, we're now here 13 months after the injunction was denied. And had we proceeded on the path of not being on an appeal, we would probably have resolved all of these issues by now. So in terms of I say this for the purpose that it appears to me that any harm that is imposed. Have you made any efforts to resolve these issues in those 13 months? We have not, your honor. So the injunction got denied, then you didn't want to play ball anymore. And we what? And you didn't want to play ball anymore. We're perfectly willing to play ball, your honor. Yeah. We'd like to find a way to resolve these things, including to resolve the safety issues and get these houses. Don't you think that a RLUIPA, though, that that maybe you're going to find it makes more to find a way to resolve them with an injunction in place. As opposed to resolve them without an injunction. Because the injunction is only against the operation of this particular ordinance, you could still couldn't you go back and impose other safety? Yes. Okay. And unfortunately, we'll probably have to because we're not we have not been made aware that those safety concerns have been correct, including the things that are subject to photographs in the record. One final question, because I don't want to prevail from my colleagues patients anymore. But what is your position to your opposing counsel's view that they should have been able to qualify for grandfathering in under the old zoning system? Yeah, I mean, we believe that they were conducting this use before before the ordinance was passed. But I we were concerned that now that the ordinance is in place, that they are conducting a different use than was in place. Like we weren't aware of the school before the ordinance was passed. It was very close in timing. But it was sometime in later in 2023 in the late summer and fall that the school was brought to our attention. So let's assume hypothetically that you folks talk to each other with an eye towards resolving the safety issues that the borough is concerned about. You think that would be a good path forward? I do. All right. I do your honor. Thank you. All right. Thank you very much for your time. Good council. Hi. I just wanted to make a few points on this. The first of which is there's a mention that we're limited to the record. And there was a expounding on what that includes. And what that includes is it includes the complaint. It includes the briefs. And I will say that a facial violation has always been alleged since the very beginning of this since the complaint. So if this court is limited to the record, which it is in most, you know, in most contexts except for witness credibility, et cetera. But the record does contain allegations of facial violations since the beginning. With respect to the places of worship that exist, and this being evidence that somehow this newly adopted ordinance is allowing them, I just have to respond that I looked up those 11 places of worship that were mentioned. Most wouldn't meet the 2023 zoning ordinance as it currently stands. So the current ones that are allowed to exist probably wouldn't need it in most cases. As for new ones, as far as we can tell, no new place of worship has ever been permitted following the adoption of the 2023 zoning ordinance. There is, and the testimony about the neighbors observing things, that's not in the record other than hearsay there. At the district court level, there was a witness for the borough that was to testify about safety. Borough never even called the witness about the safety issues. None of the exhibits that were introduced at the district court level that talked about safety issues. They didn't even identify which building the pictures pertain to. And the witness who was going to talk about safety was not even called by the borough when given the opportunity by the district court. So if it were truly about safety, why have there been no reports ever given to these people in 13 months, ever given to us? Why have there been, why has this not occurred? And the, with respect to the MICFA, I just wanted to correct the record. There were permits pulled. There were permits eventually pulled for electric. There were permits pulled for the MICFA. This happened in 2022. And it's interesting that they say that they determined that it is at least a place of  And to that end, you know, that's what we've, that's what it really, really is. But nothing can be more shocking than the allegation that this is self-inflicted. There have been a bountiful quantity of attempts by plaintiffs to resolve this before opposing counsel's involvement, after opposing counsel's involvement, even reference to a section of the zoning ordinance that provides for a stay of proceedings. And that pertains to stays when you appeal to the court of common plea as an action. But the spirit of that is clear that a stay or an enjoyment is actually foreseen and foreshadowed in the zoning ordinance itself. But the idea that it's self-inflicted, that 13 months have gone by when these two buildings have not been able to be used is just a shock, is a shocking allegation. And it's not in any way self-inflicted. Multiple attempts have been made to resolve this. Can we see counselor Sardarbar for just a minute? It's off the record. Gentlemen, thank you for your arguments and your briefs. We'll get back to you shortly. Thank you very much. Thank you, your honor.